AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

### for the
### Eastern District of Virginia



In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
INFORMATION ASSOCIATED WITH FACEBOOK USER )   Case No.  1:19-sw-1108
ID Lin AdaMs (100026876062012)THAT IS STORED AT )
PREMISES CONTROLLED BY FACEBOOK, INC. )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
INFORMATION ASSOCIATED WITH FACEBOOK USER ID Lin AdaMs (100026876062012)THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment A

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1959(a)(3) & (a) (6) | Violent crimes in aid of racketeering activitiy |

The application is based on these facts:

See Attachment B

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

| AUSA Nicholas Murphy |
|---|

_____
*Applicant's signature*

Milagro Garcia, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

/s/
_____
Theresa Carroll Buchanan
United States Magistrate Judge
*Judge's signature*

Date: ____08/08/2019____

City and state: Alexandria, Virginia

Hon. Theresa Carroll Buchanan, Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria

AUG - 8 2019

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID Lin AdaMs (100026876062012) THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | No. 1:19-SW-1108 |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Milagro Garcia, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with Facebook user ID Lin AdaMs (100026876062012) that is stored at premises owned, maintained, controlled, and operated by Facebook Inc. ("Facebook"), an online social media and social networking company headquartered, and which accepts service of legal process, at 1601 Willow Road, Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession pertaining to the subscribers or customers associated with the listed user IDs.

2.      Since September 2018, I have been a Special Agent with the Federal Bureau of Investigation (the "FBI").  Currently, I am assigned to a squad that investigates criminal enterprises and narcotics trafficking for the Washington Field Office, Northern Virginia Resident Agency.  I have training and experience in the areas of gang-related criminal activity, interview and interrogation techniques, evidence recovery, source recruitment, and cellular phone analysis.

I am primarily focused on investigating the criminal activities of the violent international street gang Mara Salvatrucha Trece, also known as MS-13, and have become familiar with the structure and organization of MS-13, gang terminology and indicia, and MS-13's use of social media applications to communicate and recruit. I am a native Spanish speaker and have translated and summarized social media communications in my capacity as an FBI Special Agent.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other federal and state law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Marlon Edgardo HUEZO RIVERA a/k/a "OSCURO" (hereinafter "**HUEZO RIVERA**"), among other known and unknown co-conspirators, have committed violations of 18 U.S.C. § 1959(a)(3) and (a)(6) (violent crime in aid of racketeering activity). On April 18, 2019, a federal grand jury sitting in the Eastern District of Virginia returned a two count Indictment charging **HUEZO RIVERA** with assault with a dangerous weapon in aid of racketeering activity and conspiracy to commit the same, in violation of Title 18, United States, Code, Sections 1959(a)(3) and (a)(6). On May 16 and June 6, 2019, the two co-defendants charged via indictment with **HUEZO RIVERA**, Kevin Barrera Barrera ("BARRERA BARRERA") and Denis Oklides Martinez Melendez ("MARTINEZ MELENDEZ"), each pled guilty to assault with a dangerous weapon in aid of racketeering activity. Previously, on March 29, 2019, the fourth identified adult participant in the charged assault, Jose Ochoa Del-Cid ("DEL-CID"), pled guilty pre-indictment to assault with a dangerous weapon in aid of racketeering activity. There is also

2

probable cause to search the information described in Attachment A for evidence of these crimes, as further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense[s] being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

### MS-13 and "SLS" Clique Background

6.      The FBI is conducting an investigation into the activities of the transnational criminal street gang *Mara Salvatrucha* ("MS-13"). MS-13 originated in Los Angeles, California and has spread throughout the United States, Canada, Mexico, and Central America. The majority of the gang is ethnically composed of Hispanics and is currently active in urban and suburban areas of the United States. Based on my training and experience, I know that MS-13 members are required to commit acts of violence to further the interests of the gang. These violent acts are often directed against rival gang members, MS-13 members who have violated gang rules or otherwise disrespected the gang, and persons who are suspected of cooperating with law enforcement. The FBI has developed evidence that members and associates of the Silva Locos Salvatruchas ("SLS") clique of MS-13 in Northern Virginia have committed violent crimes in aid of racketeering, which are the subject of the current investigation. The FBI and the Fairfax County Police Department have been conducting a joint investigation of the SLS clique since 2017.

7.      Investigators have learned that Jose Saul MOYA ARRIAZA a/k/a "ESCORPION" (hereinafter "MOYA ARRIAZA") and OCHOA DEL-CID a/k/a "VAGO", are both high ranking

3

members of the SLS clique.   MOYA ARRIAZA is known to be the "First Word" or first in command of the SLS clique and OCHOA DEL-CID is known to be the "Second Word" or second in command of the clique.

8.     Law enforcement also learned that the following individuals are members of MS-13 and are also associated with the SLS clique: BARRERA BARRERA a/k/a "MONKEY"; Erik Alexis VALLADARES COREA a/k/a "YOLO" (hereinafter "VALLADARES COREA"); Jose Moises DIAZ CEDILLO a/k/a "PONY" (hereinafter "DIAZ CEDILLO"); Marlon RAMIREZ LUCERO a/k/a "CHELE" (hereinafter "RAMIREZ LUCERO"); Allan VALLADARES LARA a/k/a "RAMBO" (hereinafter "VALLADARES LARA"); Elmer VALLADARES a/k/a "SUBWAY" (hereinafter ELMER VALLADARES); Cristian Noe FLORES FLORES a/k/a "CASPER" (hereinafter   "FLORES FLORES") and Zulma Yaneth FUENTES FUENTES (hereinafter "FUENTES FUENTES").

9.     Law enforcement also learned that the following individuals are members of MS-13 and are also associated with the Chilangueras clique: **HUEZO RIVERA**; and MARTINEZ MELENDEZ a/k/a "IMPACIENTE".

**Terminology and traditional roles associated with MS-13 membership**

9.     Based on my training and experience, I know that MS-13 members and associates use certain terms to describe the organizational structure of and certain positions within the gang, including but not limited to the following:

10.     *Paisa* – a hang-around.  This is a person who is not directly involved in MS-13 activities but has knowledge of who are members and "chequeos" (defined below).  From this level, individuals could rise to "Paro."

4

11.   *Paro* – a helper.  A person who watches out for police presence (lookout in the neighborhood), makes deliveries of narcotics, drives homeboys around, delivers messages, and offers other minor assistance to the gang.  A paro does not typically know gang rules or take any part in clique meetings.   A paro could rise to a "chequeo."

12.   *Chequeo* – a prospect.  A person who is allowed to know some rules, acts as a lookout during clique and general meetings (referred to as misas), sells narcotics for the gang, helps to recruit paros and paisas, assists homeboys with gang business and illicit activities, and is actively being "walked" or trained by a senior homeboy.  This is a level a person has before they are given the 13 second beating to be "jumped" into the gang and become a "homeboy."

13.   *Homeboy* – A full member.  A person who has been jumped-in to the gang because they have proven their loyalty and worth to homeboys.  Homeboys received approval from the first word to jump-in a chequeo into a homeboy as a result of their work for the gang – they distributed narcotics, participated in gang violence, or other means of proving their worth to the gang.  Some cliques require that a chequeo kill a rival gang member or a snitch in order to earn their jump-in to become a homeboy.

14.   *First Word* – a homeboy who is in command of a clique.

15.   *Second Word* – a homeboy who is second in command of a clique.

**Abduction and Assault of Victim 1**

16.   On or about October 23, 2018, law enforcement received information that an individual who will be hereafter referred to as VICTIM 1 had been assaulted in Fairfax County, Virginia, within the Eastern District of Virginia.

17.     On November 1, 2018, law enforcement located VICTIM 1 and found that he/she had in fact been assaulted in Fairfax County, Virginia. During an interview with law enforcement, VICTIM 1 provided details of their assault.

18.     For some time, VICTIM 1 had been hanging out with VALLADARES COREA, DIAZ CEDILLO and RAMIREZ LUCERO. In the weeks prior to the above-referenced assault, VICTIM 1 had texted FUENTES FUENTES about MS-13 criminal activity and the individuals involved that concerned VICTIM 1. During these text messages, VICTIM 1 discussed whether they should get the police involved. VICTIM 1 identified FUENTES FUENTES' Facebook account as geobani.flores.14 (100013073118494). Unknown to VICTIM 1, these text conversations were discovered by OCHOA DEL-CID who was upset by the text messages because he believed VICTIM 1 was snitching.

19.     On October 20, 2018, VALLADARES COREA and DIAZ CEDILLO texted VICTIM 1 to invite VICTIM 1 to the park behind James Lee Community Center, located at 2855 Annandale Road, Falls Church, Virginia, within the Eastern District of Virginia. BARRERA BARRERA also called VICTIM 1 on multiple occasions between approximately 5:30 p.m. and approximately 7:30 p.m., asking VICTIM 1 to come to the park. VICTIM 1 agreed to go with them, believing they were going to hang out in the park. In reality, VICTIM 1 was invited to the park so that he could be assaulted by members and associates of MS-13 who believed that he was a snitch.

20.     Once OCHOA DEL-CID arrived at the park with **HUEZO RIVERA**, VICTIM 1 was escorted to a different area of the park where **HUEZO RIVERA** stayed with him while the gang conducted a meeting. At that time OCHOA DEL-CID, **HUEZO RIVERA**, MARTINEZ MELENDEZ, BARRERA BARRERA, VALLADARES COREA, DIAZ CEDILLO, and several

6

other masked individuals were assembled at the park. Some of the assembled individuals had brought bats to the park.

21.     During the gang meeting OCHOA DEL-CID explained that the VICTIM 1 was going to be assaulted in waves of three by the group for breaking the gang's rules. OCHOA DEL-CID signaled for **HUEZO RIVERA** to bring VICTIM 1 back to the group, at which time OCHOA DEL-CID advised VICTIM 1 that they knew about the text that he/she sent, called VICTIM 1 a "snitch", and advised that he/she would have to be punished. When VICTIM 1 denied being a snitch to the group, BARRERA BARRERA produced screenshots he had obtained of the conversation between VICTIM 1 and FUENTES FUENTES and told VICTIM 1 to stop lying because they had the evidence. OCHOA DEL-CID told VICTIM 1 that he/she could not leave, that he/she needed to take his/her beating, and if he/she ran or tried to run he/she would be "killed." VICTIM 1 was then assaulted by each member of the assembled group with bats, sticks and personal weapons.

22.     VICTIM 1 was hit all over his/her body, which resulted in severe injuries including breaking VICTIM 1's left arm and elbow. VICTIM 1 noted that, in the immediate aftermath of the assault, his/her arm was facing the wrong way, and an unknown subject tried to "fix it" and face it the "right way". VICTIM 1 was then forced to walk away from the group and was told to go home. VICTIM 1 stated that he/she did not call 911 at that time, because he/she "wouldn't have lived."

23.     During interviews with law enforcement, VICTIM 1 positively identified OCHOA DEL-CID, VALLADARES COREA (juvenile), DIAZ CEDILLO (juvenile), BARRERA BARRERA, MARTINEZ MELENDEZ and **HUEZO RIVERA** as subjects who assaulted him on

October 20, 2018.  VICTIM 1 stated that other currently unknown Latino male individuals were also present during and participated in VICTIM 1's beating.

### Interviews of Defendants and Co-Conspirators

24.     On November 9, 2018, law enforcement officers arrested OCHOA DEL-CID, VALLADARES COREA, DIAZ CEDILLO, and **HUEZO RIVERA** pursuant to arrest warrants issued by the Circuit Court of Fairfax County, Virginia for various violations of Virginia Code related to VICTIM 1's assault.  On December 19, 2018, BARRERA BARRERA was successfully located and arrested pursuant to an arrest warrant issued by the Circuit Court of Fairfax County, Virginia for various violations of Virginia Code related to VICTIM 1's assault.

25.     Following his arrest, on November 9, 2018, law enforcement interviewed OCHOA DEL-CID at the Fairfax County Police Department ("FCPD") McLean District Station.  Prior to the interview, OCHOA DEL-CID was advised of his Miranda rights, which he waived prior to speaking with law enforcement.  During the interview, OCHOA DEL-CID confessed his involvement in the abduction and assault of VICTIM 1.  OCHOA DEL-CID stated that a large group of individuals were present and participated in the assault, including some who were using bats.  OCHOA DEL-CID confirmed that VALLADARES COREA, DIAZ CEDILLO, **HUEZO RIVERA** and BARRERA BARRERA were present during and participated in VICTIM 1's assault.  OCHOA DEL-CID explained that the assault lasted for approximately three (3) minutes. OCHOA DEL-CID stated that VICTIM 1 was assaulted because he was talking smack about the clique.  OCHOA DEL-CID stated that MOYA ARRIAZA was aware of the assault.  He further explained that he coordinated the assault and instructed several SLS members to come to the park to participate in the assault.  Many other MS-13 members and cliques, who OCHOA DEL-CID did not personally invite to the park, also came and participated in VICTIM 1's assault.

8

26.     Following his arrest, on November 9, 2018, law enforcement interviewed DIAZ CEDILLO at the FCPD McLean District Station.  Prior to the interview, DIAZ CEDILLO was advised of his Miranda rights, which he waived prior to speaking with law enforcement.  During the interview, DIAZ CEDILLO confessed his involvement in the abduction and assault of VICTIM 1. DIAZ CEDILLO stated that he was in police custody because VICTIM 1 had it coming.  DIAZ CEDILLO stated that he received a phone call from OCHOA DEL-CID, at approximately 7:00 p.m. on October 20, 2018, instructing him to come to the James Lee Community Center.  DIAZ CEDILLO stated that OCHOA DEL-CID was present when he arrived at the James Lee Community Center around 8:00 p.m., along with many others who were wearing masks and holding bats.  DIAZ CEDILLO explained that OCHOA DEL-CID was wearing a mask that covered the bottom half of his face during the assault but that he could tell it was him based on the body type and voice he heard.  DIAZ CEDILLO further explained that OCHOA DEL-CID told him to be a lookout so that the group could administer a "calenton" to VICTIM 1, which was supposed to take one minute.  DIAZ CEDILLO explained that the assault occurred because OCHOA DEL-CID believed that VICTIM 1 was a snitch.  DIAZ CEDILLO stated that VALLADARES COREA, BARRERA BARRERA, and **HUEZO RIVERA** were also present and participated in the assault of VICTIM 1.  DIAZ CEDILLO confirmed that OCHOA DEL-CID, BARRERA BARRERA, HUEZO RIVERA and VALLADARES COREA are part of MS-13.

27.     Following his arrest, on December 19, 2018, law enforcement interviewed BARRERRA BARRERRA at the FCPD Mason District Station.  Prior to the interview, BARRERRA BARRERRA was advised of his Miranda rights, which he waived prior to speaking with law enforcement.  During the interview, BARRERRA BARRERRA confessed his involvement in the abduction and assault of VICTIM 1.  BARRERA BARRERA stated that,

9

initially, he and DIAZ CEDILLO were going to the park to smoke marijuana. BARRERA BARRERA claimed that, after they got to the park, a large group showed up. BARRERA BARRERA stated that OCHOA DEL-CID was in charge of the group and others with masks on showed up. BARRERA BARRERA stated that these individuals were all associates of MS-13 and that there were several cliques involved, including SLS and the Hempstead clique. OCHOA DEL-CID told VICTIM 1 to get into the center of the group so that he could be disciplined for wanting to turn RAMIREZ LUCERO in to the police. OCHOA DEL-CID then ordered the others present to start assaulting VICTIM 1, some of whom did so with bats. BARRERA BARRERA stated that an unknown subject that goes by "Chaparro" is the individual who broke the victim's arm and is the one who brought the bats to the park.

28.     On March 25, 2019, law enforcement officers arrested MARTINEZ MELENDEZ pursuant to an arrest warrant issued by the United States District Court for the Eastern District of Virginia, for assault with a dangerous weapon in aid of racketeering, in violation of Title 18, United States Code, Sections 1959(a)(3) and 2. Following his arrest, on March 25, 2019, law enforcement interviewed MARTINEZ MELENDEZ at the Fairfax County Police Department ("FCPD") Mason District Station. Prior to the interview, MARTINEZ MELENDEZ was advised of his Miranda rights, which he waived prior to speaking with law enforcement. During the interview, MARTINEZ MELENDEZ confessed his involvement in the abduction and assault of VICTIM 1 and also stated that **HUEZO RIVERA** was present and participated in VICTIM 1's assault. MARTINEZ MELENDEZ further stated that **HUEZO RIVERA** contacted him on his cellular phone and told him to meet him at the James Lee Park because something was going to go down there that evening.

10

29.     On August 5, 2019, law enforcement interviewed VALLADARES CORREA. During the interview VALLADARES CORREA identified the Facebook account Lin AdaMs (100026876062012) as belonging to **HUEZO RIVERA**. The public portion of the account contained conversations between **HUEZO RIVERA** and other co-conspirators.

## REVIEW OF TARGET FACEBOOK ACCOUNTS

### Facebook Account VG Gamez (100027754359029)

30.     Through gang intelligence and subsequent investigation, law enforcement learned that OCHOA DEL-CID had a Facebook account with User ID VG Gamez, 100027754359029 (hereinafter "VG Gamez"). Law Enforcement obtained a state search warrant for the VG Gamez Facebook account on November 27, 2018. A review of the search warrant return identified the following information.

31.     On October 21, 2018, the day after VICTIM 1's assault, OCHOA DEL-CID sent a message to the First Word of the SLS clique, MOYA ARRIAZA, at the Facebook account Moya-Arriaza Saul (100002262964694), stating that he had to inform him of something. On October 22, 2018, OCHOA DEL-CID communicated with MOYA ARRIAZA via a Facebook phone call.

32.     On October 22, 2018, the Facebook account Flakhitto Martinez (100007205882222), identified by law enforcement as belonging to MARTINEZ MELENDEZ, sent a message to OCHOA DEL-CID that included a picture of an individual laying on a hospital bed with both arms bandaged and with a sleeping emoji over the individuals face. MARTINEZ MELENDEZ stated to OCHOA DEL-CID "We have a problem" to which OCHOA DEL-CID responded, "who is that". MARTINEZ MELENDEZ responded, "That guy". During an interview with law enforcement, VICTIM 1 positively identified the individual in the picture shared by MARTINEZ MELENDEZ as himself/herself.

33.     On October 25, 2018, OCHOA DEL-CID sent a message to MOYA ARRIAZA including two (2) news articles referencing a stabbing in Falls Church, Virginia.  MOYA ARRIAZA responded via a voice message asking if that was the individual they had assaulted or if it was another issue.

34.     On October 30, 2018, in response to a message from MOYA ARRIAZA, OCHOA DEL-CID sent a voice message reporting-in and indicating that he has not been able to patrol the zone.

35.     On November 10, 2018, the day after OCHOA DEL-CID's arrest by local law enforcement, MOYA ARRIAZA's Facebook account (100002262964694) removed OCHOA DEL-CID as a Facebook friend.

36.     On September 8, 2018 Lin AdaMs (100026876062012) sent a friend request to VG Gamez (100027754359029), which was accepted.

37.     Law enforcement identified over two hundred communications between VG Gamez (100027754359029) and Lin AdaMs (100026876062012).  Some of the communications included references to the "clique".  Law enforcement recognized the voice of **HUEZO RIVERA** in the audio files being transmitted from the Lin AdaMs account to the VG Gamez account.

<u>Facebook Account Flakhitto Martinez (100007205882222)</u>

38.     Law Enforcement obtained a Federal search warrant for the Flakhitto Martinez Facebook account on January 25, 2019.  A review of the search warrant return identified the following information.

39.     Law Enforcement identified communications between the Flakhitto Martinez Facebook account belonging to MARTINEZ MELENDEZ and the account Malandro Cortez (100011600416390) belonging to **HUEZO RIVERA**.

12

40.     On May 27, 2017 Malandro Cortez (100011600416390) sent a message to Flakhitto Martinez (100007205882222) including a photo and explained that one of the individuals on the photo left the gang and was the one that snitched on "ELMER". Flakhitto Martinez responded stating that they were going to be on the lookout and recommended that they lure him with lies.

41.     On June 7, 2017 the Facebook account Cortez Cortez (100017833063691) sent a message to Flakhitto Martinez (100007205882222) stating that he was "OSCURO", which is **HUEZO RIVERA's** gank moniker. Law Enforcement reviewed the public view of the Cortez Cortez (100017833063691) account and identified a profile picture of **HUEZO RIVERA** and multiple pictures of MS-13 memes.

42.     On June 10, 2017 Flakhitto Martinez (100007205882222) sent a message to Moris Castro (100006099557079) providing a screenshot with a phone number: 571-839-6335 (hereinafter the "571 number"). Flakhitto Martinez stated the 571 number belonged to "Oscuro" and that Oscuro was from his clique.

43.     Law Enforcement obtained a Federal search warrant for the Malandro Cortez (100011600416390) and Marlon Rivera Castro (100009091330471) Facebook accounts on February 8, 2019. A review of the search warrant returns identified profile pictures of **HUEZO RIVERA** and the 571 was listed on the account.

44.     Law enforcement identified another Facebook account for **HUEZO RIVERA**, malandro.firme (100020870191309). Although the public view of this account is no longer visible, law enforcement identified communications between malandro.firme (100020870191309) and Flakhitto Martinez (100007205882222), to include an audio file on August 10, 2017. Law enforcement recognized the voice of **HUEZO RIVERA** in the audio file being transmitted from malandro.firme (100020870191309) to Flakhitto Martinez (100007205882222).

13

Facebook Account La Bestia Suelta (100027646280068)

45.     Law Enforcement obtained a Federal search warrant for the La Bestia Suelta (100027646280068) Facebook account, on March 11, 2019. A review of the search warrant return identified the following information.

46.     The Facebook account listed Lin AdaMs (100026876062012) as a friend.

47.     Law enforcement identified over two hundred communications between La Bestia Suelta (100027646280068) and Lin AdaMs (100026876062012). Some of the communications included references to the "clique". Law enforcement recognized the voice of **HUEZO RIVERA** in the audio files being transmitted from the Lin AdaMs account to the La Bestia Suelta account.

## **Identification and Use of Social Networking Internet Sites**

48.     Based on my training and experience, I know that gang members, in particular, MS-13 members and associates, use mobile telephones, text messages, computers, and social networking internet sites to communicate with one another. MS-13 gang members frequently link their social networking profiles with social networking profiles belonging to other members of the gang. MS-13 gang members communicate with one another through the private messaging features associated with social networking sites. MS-13 gang members use the private messaging features in order to communicate clandestinely with other members of the gang and to conceal specific information about the gang from law enforcement. MS-13 gang members are also known to use multiple social media platforms and accounts.

49.     Based on my training and experience, I also know that MS-13 members and associates often post pictures and videos of themselves and other members displaying gang hand signs and wearing gang paraphernalia in order to signify their membership in the gang. They also post pictures of themselves with various weapons, including firearms, knives, and machetes. They

14

also use social media sites to post pictures and videos, and share communications regarding criminal activity in which they and other members and associates have participated.

50.     Based on my training and experience, I also know that photographs and videos posted to social media platforms can serve as circumstantial evidence of a perpetrators' guilt, insofar as, for example, the photographs or videos show the suspects wearing similar clothing to the clothing that they were wearing during the commission of crime, or membership in the MS-13 gang, or reveal, through location-tagging features, that the target account(s) was used in the vicinity of VICTIM 1's assault at the time the assault occurred.

51.     Based on the foregoing, there is probable cause to believe that Facebook user ID Cortez Cortez (100017833063691) and Facebook Messenger account Malandro.firme (100020870191309) contain records and information, including communications, photographs and location data that constitute evidence of violations of 18 U.S.C. § 1959(a)(3).

52.     As part of the investigation, the FBI sent preservation requests to Facebook requesting that information associated with the Facebook user IDs identified in Attachment A.

## BACKGROUND CONCERNING FACEBOOK

47.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

48.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and

zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

49.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

50.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

51.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their

Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

52.     Facebook allows users to upload photographs and videos, which may include any metadata such as location that the user transmitted when he or she uploaded the photograph or video. It also provides users the ability to "tag" (*i.e.*, label) other Facebook users in a photograph or video. When a user is tagged in a photograph or video, he or she receives a notification of the tag and a link to see the photograph or video. For Facebook's purposes, the photographs and videos associated with a user's account will include all photographs and videos uploaded by that user that have not been deleted, as well as all photographs and videos uploaded by any user that have that user tagged in them.

53.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles. Such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a video calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

54.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

55.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

56.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

57.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photographs that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

58.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

59.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

60.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

61.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user

accesses or uses one of these applications, an update about the user's access or use of that application may appear on the user's profile page.

62.    Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

63.    Facebook also retains IP logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

64.    Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts

19

between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

65. Facebook maintains a small piece of computer code called a session cookie on its users' computers that allows Facebook to provide custom content. By analyzing these session cookies, Facebook is able to connect different Facebook accounts to identify accounts that are created separately using different e-mail addresses.

66. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photographs (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the IP addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crimes under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crimes under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-

location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Lastly, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offenses under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan to commit a crime) or consciousness of guilt (*e.g.*, deletion of account information in an effort to conceal evidence from law enforcement).

67.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

68.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

69.     Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that within the Facebook accounts with user ID Lin AdaMs (100026876062012) exists evidence of violations of 18 U.S.C. §§ 1959(a)(3) and (a)(6). I

respectfully request that this Court issue a warrant to search the account, as described in Attachment A, and to seize the evidence specified in Attachment B.

Respectfully submitted,

Milagro Garcia
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 8th day of August 2019.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

The Honorable Theresa C. Buchanan
United States Magistrate Judge

22

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

This warrant applies to information associated with the Facebook Inc. ("Facebook") account user IDs identified below, from January 1, 2018 to the present, that are stored at premises owned, maintained, controlled, or operated by Facebook, an online social media and social networking company headquartered in Menlo Park, California.

- Lin AdaMs (100026876062012)

## ATTACHMENT B

### PARTICULAR THINGS TO BE SEIZED

**I.    Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. 2703(f), Facebook is required to disclose the following information to the government for the username or account listed in Attachment A for the period of January 1, 2018 through Present:

    (a)    All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, device identifiers, and other personal identifiers;

    (b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

    (c)    All photos uploaded by that username or account and all photos uploaded by any user that have that user tagged in them;

    (d)    All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected Friend requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

    (e)    All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

    (f)    All "check ins" and other location information;

24

(g)     All IP logs, including all records of the IP addresses that logged into the account; all device identifier logs, including all records of the device identifiers that logged into the account;

(h)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked;"

(i)     All information about the Facebook pages that the account is or was a "fan" of;

(j)     All past and present lists of friends created by the account;

(k)     All records of Facebook searches performed by the account;

(l)     All information about the user's access and use of Facebook Marketplace;

(m)     The types of service utilized by the user;

(n)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken;

(q)     Any records associated with photos posted to the user's Facebook account; any records associated with Instagram photos posted to other Facebook accounts that the user commented on or "liked"; and

(r)     All other accounts which are forensically linked to the account identified in Attachment A through cookies, e-mail addresses, phone numbers or other account information; and

(s)     All metadata for photos and videos.

## II.   Information to be seized by the government

All information described above in Section I that relates to violations of 18 U.S.C. § 1959

(violent crimes in aid of racketeering) for the Facebook user IDs identified in Attachment A,

including, but not limited to, information pertaining to the following matters:

(a)   communications, images, videos or information reflecting association with MS-13;

(b)   communications or information relating to the planned receipt or distribution of extortion funds;

(c)   communications with, or information relating to Victim #1;

(d)   communications, images, videos, or information reflecting the planning or execution of any MS-13 violent gang activities such as extortion, murder, assault, stabbing, or threats to commit acts of violence that may constitute violent crimes in aid of racketeering;

(e)   communications, images, videos, or information regarding weapons such as knives or firearms;

(f)   communications, images, videos, or information regarding the coordination and planning of gang meetings;

(g)   address/phone books or contact information that reflect names of potential criminal associates such as MS-13 gang members or associates;

(h)   evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crimes under investigation and to the Facebook account owner;

(i)   recordings relating to the identity of the person(s) who communicated with the user ID about matters relating to Victim #1 and/or the crimes under investigation, including records that help reveal their whereabouts; and

(j)   evidence indicating the Facebook accounts owners' or users' state of mind as it relates to the crimes under investigation.

26